United States Court of Appeals
Fifth Circuit

**F I L E D**

December 19, 2008

Charles R. Fulbruge III
Clerk

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 07-30443

JOHN THOMPSON

Plaintiff-Appellee

v.

HARRY F CONNICK, in his official capacity as District Attorney; ERIC DUBELIER, in his official capacity as Assistant District Attorney; JAMES WILLIAMS, in his official capacity as Assistant District Attorney; EDDIE JORDAN, in his official capacity as District Attorney; ORLEANS PARISH DISTRICT ATTORNEY'S OFFICE

Defendants-Appellants

Appeal from the United States District Court
for the Eastern District of Louisiana

Before KING, STEWART, and PRADO, Circuit Judges.

PRADO, Circuit Judge:

In Brady v. Maryland, 373 U.S. 83, 87 (1963), the Supreme Court held that due process requires the prosecution in a criminal case to turn over evidence that is favorable to the accused when the evidence is material to guilt or punishment. The Supreme Court later expanded the Brady rule to require the disclosure of evidence that is relevant to the credibility of key government witnesses. See Giglio v. United States, 405 U.S. 150, 154 (1972). In the criminal proceedings that prompted this lawsuit, it is undisputed that Brady evidence

was not turned over to the defense. As a result, Plaintiff-Appellee John Thompson ("Thompson") was convicted of an attempted armed robbery of which he was actually innocent. Attorneys in the Orleans Parish District Attorney's Office ("the DA's Office") then used the attempted armed robbery conviction to help secure a conviction and death sentence for Thompson in an unrelated murder case. Eighteen years later—and one month before his scheduled execution—Thompson's investigators uncovered the exculpatory evidence that indisputably cleared Thompson of the armed robbery charge. Thompson was then retried for the murder and found not guilty.

Thompson now seeks damages for the eighteen years he spent in prison, fourteen of which were in solitary confinement on death row. After a jury trial lasting several days, the jury determined that the DA's Office was deliberately indifferent to the need to train, monitor, and supervise its attorneys on Brady principles. The jury awarded Thompson $14 million in damages, and the district court added approximately $1 million in attorneys' fees. Defendants challenge that result on multiple grounds. Finding no reversible error for the majority of Defendants' arguments, we AFFIRM in large part. Because the district court erroneously included non-liable defendants in the judgment, we REVERSE in part and REMAND with instructions to remove those defendants from the judgment.

## I. FACTUAL BACKGROUND

On December 6, 1984, Raymond T. Liuzza Jr. ("Liuzza") was robbed, shot, and killed outside of his home in New Orleans. Because Liuzza was the son of a prominent executive, the murder received a lot of attention in the community. Approximately three weeks later, on December 28, 1984, siblings Jay, Marie, and Michael LaGarde were the victims of an armed robbery while in their car in New Orleans. Jay LaGarde fought off the perpetrator, and, in the scuffle, some of the perpetrator's blood ended up on the cuff of Jay's pants. As part of the

police investigation, crime scene technicians took a swatch of the pants with the perpetrator's blood on it.

On January 17, 1985, Thompson and Kevin Freeman ("Freeman") were arrested and charged with the Liuzza murder. As a result, Thompson's picture was published in the New Orleans Times-Picayune. The LaGardes' father showed his children the picture, and they believed that Thompson was the individual who had attempted to rob them. They contacted the DA's Office and identified Thompson as the armed robber.

The LaGardes' armed robbery case was then screened by assistant district attorney Bruce Whittaker ("Whittaker") as part of the case handling process that then-District Attorney Harry F. Connick ("Connick") instituted. Screening was designed to identify the cases in which charges should be brought and those in which no further action should be taken. The screening process would begin when the New Orleans police department made an arrest. The police department would then send a police report to the DA's Office where it was reviewed by an assistant district attorney (the screener) who determined whether a case could be made against the alleged perpetrator. The screener then filled out a Screening Action Form indicating whether charges should be brought and, if appropriate, making suggestions about the way the case should be handled.

With respect to the armed robbery of the LaGardes, Whittaker approved the case for prosecution and, after noting that a crime scene technician had taken a swatch of Jay LaGarde's pants with blood on it, wrote on the Screening Action Form that the government "[m]ay wish to do blood test." Whittaker also indicated that the case should be handled by Eric Dubelier ("Dubelier") as a special prosecutor. Whittaker explained at trial that the case was sent to Dubelier because it involved the same defendant (Thompson) as the Liuzza murder case, which Dubelier was already handling.

3

In a strategic move, the district attorneys successfully petitioned the Orleans Parish Criminal District Court to switch the order of the trials so that Thompson would be tried for the armed robbery first. The idea was that a guilty verdict in the armed robbery case would make Thompson unwilling to take the stand in the murder trial (due to the fact that a conviction from the attempted armed robbery trial could be entered into evidence against him, as impeachment, if he testified) and increase the likelihood of the death penalty.

On March 11, 1985, James Williams ("Williams") handled a hearing on behalf of the DA's Office regarding a motion to suppress in the LaGarde armed robbery case.[1] At the conclusion of the hearing, Williams, noting the reference to a blood test on the Screening Action Form, stated in open court that "it's the state's intention to file a motion to take a blood sample from the defendant, and we will file that motion—have a criminalist here on the 27th." There is no indication that the DA's Office ever sent anyone to test Thompson's blood.

Approximately one week before the armed robbery trial, the bloody swatch from Jay LaGarde's pants was sent to be tested, although the record does not reveal who ordered the test. Two days before the armed robbery trial, Whittaker received a crime lab report that stated that the armed robbery perpetrator's blood type was type B. Whittaker stated that he placed the report on Williams's desk, but Williams claims that he never saw the report. Regardless, the report was never turned over to Thompson.[2] Several days before the armed robbery trial, Dubelier asked Williams to act as lead prosecutor in the case. Therefore, the armed robbery case was tried by Williams and assistant district attorney Gerry Deegan ("Deegan") on April 11 and 12, 1985.

---

[1] Williams explained that he was asked to handle the hearing because Dubelier was unavailable at that time.

[2] Thompson's defense counsel had submitted a request for exhibits and scientific evidence that were favorable to Thompson. Dubelier's written reply was "[i]nspection to be permitted." The bloody pant leg was sent to be tested the day after Dubelier's reply was filed.

On the first day of trial, Deegan checked all of the armed robbery evidence out of the police property room, including the bloody swatch from Jay LaGarde's pants. Deegan then checked the evidence into the court property room, but never checked in the pants swatch.[3] Williams never mentioned the blood evidence at trial and relied primarily on eyewitness testimony. The jury found Thompson guilty of attempted armed robbery, and he was sentenced to forty-nine and one-half years in prison.

Dubelier and Williams then tried Thompson for the Liuzza murder from May 6 to 8, 1985. At the trial, Freeman (the other individual who had been charged with the murder) testified that Thompson shot Liuzza. Roger Perkins ("Perkins"), an acquaintance of Thompson's, testified that Thompson made incriminating statements about the Liuzza murder and that he had sold Thompson's gun for him. There was also testimony by police officer David Carter and eyewitness Paul Schliffka ("Schliffka"). Schliffka described the perpetrator's hair as "short" and as an "afro." Carter testified that, when he first questioned Schliffka, Schliffka described the perpetrator's hair as "black and short, afro style."

Due to his attempted armed robbery conviction, Thompson chose not to testify on his own behalf. Had he testified, the district attorney likely would have entered his attempted armed robbery conviction into evidence against him for purposes of impeachment.[4] The jury convicted Thompson of first-degree murder. During the sentencing phase, Marie LaGarde testified about Thompson's attempt to rob her family and her brother's actions in fighting him off. Dubelier emphasized this testimony in his closing argument, asserting that there easily could have been three more murders and that a death sentence was

---

[3] At minimum, Whittaker, Deegan, and Williams knew about the blood evidence.

[4] The criminal district court denied Thompson's motion in limine to prevent the admission of his attempted armed robbery conviction.

5

necessary to punish Thompson because he was already set to spend forty-nine and one-half years in prison for the attempted armed robbery. The jury sentenced Thompson to death.

In the fourteen years after his murder conviction, Thompson exhausted all of his appeals. His execution was set for May 20, 1999, and his attorneys informed him that there were no more options for appeal. Then, in late April 1999, one of Thompson's investigators came across a microfiche copy of the crime lab report containing the blood type of the armed robbery perpetrator. Thompson was tested and found to be blood type O, making it impossible for him to have been the armed robber. Thompson's attorneys presented this information to the DA's Office, which then moved for a stay of execution. In the ensuing investigation, it was uncovered that, in 1994, Deegan confessed to Michael Riehlmann ("Riehlmann"), a former assistant district attorney, that he (Deegan) had intentionally withheld the blood evidence. Deegan made this confession shortly after being told that he had only months to live as the result of cancer. Riehlmann did not tell anyone of the confession until the blood evidence was discovered in 1999.[5]

Thompson further asserts that other Brady evidence was not turned over as required. Several police reports containing eyewitness descriptions of the murderer that did not match Thompson's description were not turned over to the defense, despite the defense's request for all police reports containing descriptions inconsistent with Thompson's general appearance. For example, one police report indicated that Schliffka described the perpetrator as having "close-cut hair" and made no reference to an "afro style" haircut. At the time of the murder, Thompson's hair was decidedly "afro style," while Freeman's was "close-cut." Thompson also asserts that the DA's Office did not disclose the fact

---

[5] Riehlmann faced disciplinary proceedings for withholding the information.

that Perkins received a monetary award from the Liuzza family for identifying the murderer.

Following the stay of execution, Connick moved to vacate the armed robbery conviction and did not retry Thompson for that crime.[6] Connick also convened a grand jury to investigate the concealment of the blood evidence, but eventually dismissed the grand jury. John Glas ("Glas"), the assistant district attorney who was prosecuting the concealment charges, resigned in protest of the dismissal and testified in the instant case that the evidence supported the charges.

Thompson filed for post-conviction relief on the murder conviction and, in 2001, the criminal district court changed his death sentence to life-in-prison, as the attempted armed robbery conviction had been used as evidence against him during the sentencing phase. The Louisiana Fourth Circuit Court of Appeals reversed Thompson's murder conviction in 2002, finding that the attempted armed robbery conviction unconstitutionally deprived Thompson of his right to testify in his own defense at his murder trial. State v. Thompson, 825 So. 2d 552, 557 (La. Ct. App. 2002). The DA's Office retried Thompson for the Liuzza murder, and, free of the attempted armed robbery conviction, Thompson testified in his own defense. In addition, Thompson was able to use thirteen pieces of evidence that the prosecutors did not turn over during the first murder trial. This evidence included the police and incident reports described above, photographs, statements by Freeman and Perkins, an audiotape of Perkins, and information regarding the monetary award given to Perkins. Sheri Hartman

---

[6] In this case, Defendants did not object to the district court's instruction to the jury that as a matter of law the nonproduction of the blood evidence violated Thompson's constitutional rights. The district court based its decision on the Louisiana Fourth Circuit Court of Appeals's finding that "the State's intentional hiding of exculpatory evidence in the armed robbery case led to his improper conviction in that case." State v. Thompson, 825 So. 2d 552, 557 (La. Ct. App. 2002). On appeal, Defendants have not argued that the blood evidence was not exculpatory or that its nondisclosure was not a Brady violation.

Kelly, Stephen McAlister, and Rosemary Cash McAlister, eyewitnesses who the police had not previously disclosed to Thompson, also testified about the Liuzza murder. Freeman, the DA's Office's key witness in the first murder trial, had been killed during the interval between the first and second trial. However, the state court permitted the DA's Office to read relevant portions of Freeman's testimony in the first trial, and Thompson's lawyers were permitted to state the questions they would have propounded on cross-examination. The jury returned a verdict of not guilty in thirty-five minutes. Thompson was then released from prison, eighteen years after he was initially arrested.

## II. PROCEDURAL HISTORY

Thompson filed suit on July 16, 2003, naming as defendants the Orleans Parish District Attorney's Office; Connick, Williams, Dubelier, and Eddie Jordan (the District Attorney in 2003) in their official capacities; and Connick in his individual capacity (collectively, "Defendants"). Thompson brought state law claims for malicious prosecution and intentional or reckless infliction of emotional distress, as well as a claim under 42 U.S.C. § 1983 for wrongful suppression of exculpatory evidence and a conspiracy claim under 42 U.S.C. § 1985(3). The district court granted summary judgment for Defendants on the state law claims on the basis of absolute prosecutorial immunity but permitted the federal claims to go forward.

The parties presented the case to a jury from February 5 to 9, 2007. Prior to the trial, Thompson dismissed the claim against Connick in his individual capacity, and, after Thompson rested, the district court dismissed the § 1985(3) conspiracy claim. At the close of evidence, the district court ruled that Dubelier and Williams were not "policymakers" and, thus, their actions could not create liability on behalf of the DA's Office. It also ruled, and stated in the jury instructions, that the nondisclosure of the blood evidence and the resulting infringement of Thompson's right to testify in the murder trial violated his

constitutional rights.[7]  Therefore, the arguments of the parties focused on whether the DA's Office had an unconstitutional policy regarding Brady evidence and whether the DA's Office adequately trained, monitored, and supervised its attorneys regarding their Brady obligations.

Following three and a half days of testimony, the jury was asked the following two questions concerning liability:

1.    Was the <u>Brady</u> violation in the armed robbery case or any infringements of John Thompson's rights in the murder trial substantially caused by an official policy of the District Attorney?

* * *

2.    Was the <u>Brady</u> violation in the armed robbery case or any infringements of John Thompson's rights in the murder trial substantially caused by the District Attorney's failure, through deliberate indifference, to establish policies and procedures to protect one accused of a crime from these constitutional violations?

If the jury answered "Yes" to either question, it was instructed to answer a third question regarding damages:

3.    Please state what sum of money, if any, would reasonably and fairly compensate John Thompson for damages he has actually suffered or is reasonably likely to suffer in the future as a result of the District Attorney's policy or deliberate indifference.

A little more than three hours after the jury recessed to begin deliberations, it sent out a note, which read:

---

[7] Although instructing the jury that, as a matter of law, the Brady violation in the armed robbery trial resulted in a violation of Thompson's right to testify in his murder trial, the district court allowed the jury to consider other violations of Thompson's rights in the murder trial.  The court instructed the jury that it may consider other violations as additional evidence of the DA's Office's official policy or deliberate indifference.  Defendants did not object to this instruction and, on appeal, take issue with the instruction for the first time in their reply brief.  We do not, therefore, consider Defendants' argument.  See Yohey v. Collins, 985 F.2d 222, 225 (5th Cir. 1993) ("This Court will not consider a claim raised for the first time in a reply brief.").

What does "Deliberate" Indifference mean? Does it mean <u>intentional</u> or would "Failure to monitor" be considered Deliberate?

After discussing the issue with the attorneys, the district court sent in the following response:

"Deliberate Indifference" does not necessarily mean intentional, but does require more than mere negilgence [sic] or even gross negligence. Please refer to pages 26 + 27 of the legal instructions for further guidance.

The court had originally instructed the jury that to find liability for deliberate indifference under the second question it had to conclude that "[t]he district attorney's failure to adequately train, monitor, or supervise amounted to deliberate indifference to the fact that inaction would obviously result in a constitutional violation." Pages 26 and 27 of the jury instructions clarified,

In order to find that the district attorney's failure to adequately train, monitor, or supervise amounted to deliberate indifference, you must find that Mr. Thompson has proved each of the following three things by a preponderance of the evidence:

First: The District Attorney was certain that prosecutors would confront the situation where they would have to decide which evidence was required by the Constitution to be provided to an accused.

Second: The situation involved a difficult choice, or one that prosecutors had a history of mishandling, such that additional training, supervision, or monitoring was clearly needed.

Third: The wrong choice by a prosecutor in that situation will frequently cause a deprivation of an accused's constitutional rights.

Less than half an hour later, the jury returned its verdict, answering "No" to the first question regarding whether the harm was caused by an official policy. The jury answered "Yes" to the second question regarding whether the harm was caused by a deliberately indifferent failure to establish policies and procedures. The verdict form reflects that at some point the jury checked "No" in response

10

to the second question but had crossed it out and checked "Yes." The jury then awarded Thompson $14 million in damages.[8]

The district court entered a judgment in that amount against Connick, Dubelier, Williams, and Jordan in their official capacities and against the DA's Office "jointly and in solido." Defendants filed a motion for judgment as a matter of law, a motion to amend or alter the judgment, and a motion for a new trial. The district court denied all three motions. The district court granted Thompson's motion for attorneys' fees and awarded him $1,031,841.79, entering a separate judgment to that effect. Defendants appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291, as a final judgment has been entered.

## III. DISCUSSION

A.    Statute of Limitations

On appeal, Defendants first argue that the district court erred in denying their motion for summary judgment on the issue of whether the statute of limitations barred Thompson's claim of a Brady violation in the armed robbery trial for the nondisclosure of blood evidence. The district court held that Thompson could not have brought suit prior to July 17, 2002, when the Louisiana Fourth Circuit Court of Appeals overturned Thompson's murder conviction; therefore, Thompson's suit was timely brought within one year of that day—July 16, 2003. Defendants argue that Thompson's claims accrued prior to July 17, 2002, and thus that his suit was untimely.

We review a district court's ruling on summary judgment de novo. United States v. Corpus, 491 F.3d 205, 209 (5th Cir. 2007). To determine the statute of limitations for an action brought pursuant to § 1983, we look to the forum state's personal injury limitations period. Jacobsen v. Osborne, 133 F.3d 315, 319 (5th

---

[8] Liability in this case was thus predicated on the district attorney's failure to train, monitor, or supervise. In this opinion, however, we use the term "failure to train" to encompass all three bases for liability because the parties have framed the issues on appeal in those terms.

Cir. 1998). In this instance, Louisiana's personal injury limitations period is one year. Id.; see LA. CIV. CODE ANN. art. 3492. The parties do not dispute that a one-year statute of limitations applies to this case. Instead, their dispute centers on when the one-year period began to run.

Federal law governs the date on which a § 1983 claim accrues and the limitations period starts to run. See Wallace v. Kato, 127 S. Ct. 1091, 1095 (2007). Defendants propose two dates when Thompson's claims accrued: (1) June 29, 1999—when Thompson's armed robbery conviction was vacated (insofar as the claim arises from the Brady violation during the armed robbery trial); and (2) May 26, 2001—when Thompson's death sentence was changed to life in prison (insofar as the claim asserts damages he suffered while incarcerated on death row). Use of either date would result in all or part of Thompson's suit being barred by limitations. Thompson counters that, under Heck v. Humphrey, 512 U.S. 477 (1994), he could not have filed suit until July 17, 2002—the day the court of appeals reversed his murder conviction. Because his action was filed within one year of that day, Thompson contends it was timely. The district court agreed with Thompson, basing its decision on Heck and the Louisiana court of appeals's decision that the withheld blood evidence caused Thompson not to testify in his murder trial. We thus turn to Heck's application in these circumstances.

Pursuant to Heck, a plaintiff must prove that a conviction or sentence has been reversed, expunged, declared invalid, or called into question by the issuance of a writ of habeas corpus before the plaintiff may proceed with a civil suit for damages for wrongful conviction or imprisonment. Id. at 486–87; see also Wallace, 127 S. Ct. at 1098 (holding that the Heck rule "delays what would otherwise be the accrual date of a tort action until the setting aside of an extant conviction which success in that tort action would impugn"). The Heck Court elaborated on the standard as follows:

> [W]hen a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

512 U.S. at 487 (footnote omitted). Thus, for example, if Thompson had attempted to bring suit for a Brady violation related to his attempted armed robbery conviction prior to when that conviction was vacated, his claim would have been barred by Heck because a finding that the government withheld exculpatory evidence would necessarily imply the invalidity of Thompson's armed robbery conviction. See id. at 479, 490 (dismissing claim that government had destroyed exculpatory evidence because conviction had not been vacated); Hamilton v. Lyons, 74 F.3d 99, 103 (5th Cir. 1996) (same).

In the instant case, the rationale underlying the decision by the district court is that a suit regarding the withheld blood evidence in the armed robbery case would have called the murder conviction into doubt; therefore, until the murder conviction was overturned, Heck would have barred any civil suit. The key on appeal, then, is whether a finding that the DA's Office withheld the blood evidence in the armed robbery case in violation of Brady would "necessarily imply" that the murder conviction was invalid. If not, then Thompson's suit regarding the armed robbery could have been brought as soon as the attempted armed robbery conviction was vacated in 1999, and that portion of Thompson's suit would be untimely.

When reversing Thompson's murder conviction, the Louisiana appeals court concluded that Thompson "would have testified at his murder trial but for the improper attempted armed robbery conviction." Thompson, 825 So. 2d at

556.[9] Defendants have offered no argument in opposition to this conclusion. Moreover, Defendants' actions inextricably linked the two trials. Defendants stipulated that they sought to reverse the order of the armed robbery and murder trials because "a conviction of Mr. Thompson on the armed robbery charge would effectively preclude Mr. Thompson from taking the witness stand in his own defense at the murder trial, and that the armed robbery conviction could be used in the penalty phase of the murder trial to obtain a death sentence."[10] Therefore, Thompson's failure to testify at his murder trial may be directly attributed to the district attorney's conduct that resulted in the Brady violation in the armed robbery case.

A criminal defendant's opportunity to testify in his own defense is a constitutionally protected right. Rock v. Arkansas, 483 U.S. 44, 51 (1987). In this case, the Louisiana court determined that Thompson was wrongfully denied his right to testify by the DA's Office's conduct. Thompson, 825 So. 2d at 557. The court further held that the violation of Thompson's right to testify was structural error, not reviewable for harmlessness, and that, as a consequence, Thompson was entitled to an automatic reversal of his murder conviction. See id. at 557–58. Because it is undisputed that the Brady violation in the armed

---

[9] The state court specifically noted the following statement by Thompson's counsel from the trial transcript of Thompson's first murder trial:

> Given the fact that were Mr. Thompson to take the stand, [his armed robbery conviction] would have been used against him, and after consulting with us, Mr. Thompson concurred in our decision not to take the witness stand, Your Honor.

Thompson, 825 So. 2d at 556.

[10] During Thompson's attorney's cross-examination of Williams at trial, the jury heard his deposition testimony that the two cases were intertwined:

> Q: And that's, in fact, how it was handled with the prosecution of Mr. Thompson, the cases were seen as—as intertwined and the prosecution of both was coordinated, right?
>
> [Williams]: Yes.

robbery case prevented Thompson from testifying in his murder trial and because the Louisiana court found that reversal of the murder trial was an automatic result of the violation in the armed robbery trial, Thompson's lawsuit regarding the Brady violation in the armed robbery case necessarily implied that Thompson's murder conviction was invalid. Cf. Edwards v. Balisok, 520 U.S. 641, 647–48 (1997) (holding that success on a claim alleging structural error (bias on the part of the decisionmaker), which was not reviewable for harmlessness, "necessarily impl[ies] the invalidity of the punishment imposed" (citing Arizona v. Fulminante, 499 U.S. 279, 308 (1991); Tumey v. Ohio, 273 U.S. 510, 535 (1927))). Therefore, as the district court correctly held, pursuant to Heck, Thompson could not have brought suit regarding the Brady violation in the armed robbery case until his murder conviction was overturned.[11] Cf. Wappler v. Carniak, 24 F. App'x 294, 296 (6th Cir. 2001) (unpublished) (holding that a § 1983 action does not exist where the plaintiff "claimed that his misdemeanor conviction was used to enhance his sentence in another case" because "a successful ruling on his claim would imply the invalidity of both his guilty plea and his sentence in the later case").

As a result, Thompson's claims in this case did not accrue until July 17, 2002, when the court of appeals vacated his murder conviction. Thompson filed suit within one year of that date, and thus, his lawsuit is not barred by the one-year statute of limitations. Consequently, we affirm the district court's denial of Defendants' motion for summary judgment on this point.

---

[11] Defendants did not argue in the district court that Thompson's damages related to the time he spent on death row accrued when his death sentence was changed to life in prison. We generally will not consider an argument raised for the first time on appeal. See Leverette v. Louisville Ladder Co., 183 F.3d 339, 342 (5th Cir. 1999). In any event, Defendants' argument is incorrect. Thompson has asserted § 1983 claims stemming from the nonproduction of the blood evidence in the armed robbery trial and the nonproduction of other evidence during the murder trial. His time spent on death row was a harm flowing from one or both of those claims, but not an independent claim that could separately accrue.

B.    Sufficiency of the Evidence

Defendants next contend that the evidence admitted at trial does not support a finding of deliberate indifference. Defendants raised this issue in their motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50, which the district court denied. This court reviews the denial of a motion for judgment as a matter of law de novo. Flowers v. S. Reg'l Physician Servs. Inc., 247 F.3d 229, 235 (5th Cir. 2001). However, our standard of review with respect to a jury verdict is especially deferential. Id. We can reverse the jury's verdict only if "the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." Navigant Consulting, Inc. v. Wilkinson, 508 F.3d 277, 282 (5th Cir. 2007) (internal quotation marks omitted). We must draw all reasonable inferences in favor of the nonmovant and "disregard all evidence favorable to the moving party that the jury is not required to believe." Evans v. Ford Motor Co., 484 F.3d 329, 334 (5th Cir. 2007) (internal quotation marks omitted). We may not make credibility determinations or weigh the evidence. Id.

Because this case was brought against the DA's Office and the district attorneys in their official capacities, Thompson must prove that the violation of his constitutional rights was the product of a policy or custom of the DA's Office. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Certain actions of a policymaker can also subject a governmental entity to liability under § 1983. See Woodard v. Andrus, 419 F.3d 348, 352 (5th Cir. 2005). In this case, the district court determined that Connick, as District Attorney, was a policymaker for the DA's Office. With respect to claims that a constitutional violation was caused by the government's failure to train its employees, a plaintiff must prove that the government was deliberately indifferent to the need to train. City of Canton v. Harris, 489 U.S. 378, 388–89 (1989) ("Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate

16

indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.").

Here, the jury rejected Thompson's argument that Connick's Brady policy was unconstitutional but accepted the argument that Connick was deliberately indifferent to the need to train on Brady issues. On appeal, Defendants set forth numerous arguments as to why the jury could not reasonably have concluded that Connick acted with deliberate indifference.

### 1. No Pattern of Similar Violations

Defendants first argue that there was no evidence of a pattern of similar Brady violations and that such a pattern is necessary to establish deliberate indifference. Thompson does not argue that there was evidence of a pattern, but instead contends that evidence of a pattern is not always necessary for a finding of deliberate indifference.

In City of Canton, the Supreme Court set the degree of fault for a failure-to-train case as deliberate indifference. 489 U.S. at 388. In elaborating on that standard, the Court stated that

> it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

Id. at 390. The Court then included an example in a footnote:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights. It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are "deliberately indifferent" to the need.

Id. at 390 n.10 (citation omitted). Thus, the Supreme Court recognized two possible methods of showing deliberate indifference: (1) when the need for training is obvious based on the nature of the conduct at issue and the potential for harm and (2) when there is a pattern of violations that makes it obvious to city policymakers that more training is necessary.

The Supreme Court reaffirmed the possibility that a plaintiff could prove deliberate indifference without having to show a pattern of constitutional violations in Board of the County Commissioners v. Brown, 520 U.S. 397, 409 (1997), when it observed,

> In leaving open in Canton the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right.

Therefore, the Supreme Court has made it clear that a pattern of constitutional violations is not always a prerequisite to a showing of deliberate indifference. However, the Court has limited those situations to circumstances in which the need for training is "obvious" and when the violation of rights is a "highly predictable consequence" of the failure to train.

Fifth Circuit case law is not to the contrary. None of the cases cited by Defendants in support of the pattern requirement states that evidence of a pattern is always necessary. Instead, the cases all qualify the requirement by stating that a pattern is "generally" or "usually" necessary. See, e.g., Rios v. City of Del Rio, 444 F.3d 417, 427 (5th Cir. 2006) (stating that proof of deliberate

indifference "generally requires" the plaintiff to demonstrate a pattern of violations); Estate of Davis ex rel. McCully v. City of N. Richland Hills, 406 F.3d 375, 381 (5th Cir. 2005) (stating that a plaintiff "usually" must demonstrate a pattern of violations); Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force, 379 F.3d 293, 309 (5th Cir. 2004) (stating that deliberate indifference "generally requires" proof of a pattern of violations). This court's precedent is thus consistent with the Supreme Court's limitation of single-incident liability to the narrow circumstances in which the need for training is "obvious" and when the violation of rights is a "highly predictable consequence" of the failure to train.

Indeed, this court has explicitly recognized that a single incident of misconduct can, in the right circumstances, give rise to a claim of deliberate indifference. See Roberts v. City of Shreveport, 397 F.3d 287, 295 (5th Cir. 2005) (discussing the Supreme Court's description in Board of the County Commissioners v. Brown, of when a single act may be sufficient to prove deliberate indifference); Burge v. St. Tammany Parish (Burge II), 336 F.3d 363, 373 (5th Cir. 2003) (recognizing potential applicability of single-incident liability where "the facts giving rise to the violation are such that it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy or failure to train"); Brown v. Bryan County, 219 F.3d 450, 463 (5th Cir. 2000) (permitting a jury finding of liability for deliberate indifference where no pattern of similar incidents existed in a case involving a failure to train or supervise). Consequently, the fact that Thompson did not establish a pattern of Brady violations by the DA's Office is not dispositive of his claims.

Further, the evidence developed at trial clearly demonstrates that this case falls within the Supreme Court's description of the narrow range of situations that do not require a pattern of misconduct before deliberate

19

indifference can be shown. Here, there was evidence that Connick was aware that the attorneys in the DA's Office would be required to confront Brady issues on a regular basis and that failure to properly handle those issues would result in constitutional violations for criminal defendants. As Connick testified,

> Q: . . . Would you agree, Mr. Connick, that as the District Attorney, you were aware that from time to time the State would come into possession of Brady evidence in criminal cases?
>
> [Connick]: Of course.
>
> Q: And would you also agree with me that you also knew that if the favorable evidence came into possession of the State and if it wasn't produced to the defense, the result of that would be a violation of the accused's constitutional rights?
>
> A: Yes.

Thompson's legal expert, Joseph Lawless, further testified:

> [E]very district attorney knows that at some point in a prosecutor's career they are going to come into possession of evidence that tends to be exculpatory of a defendant or tends to impeach other witnesses. And they also understand that failure to turn that information over under Brady is going to result in a serious constitutional violation of a criminal defendant's rights.

> There was also evidence that the need to train about Brady was obvious. Many of the attorney witnesses in this case testified that Brady was a "gray" area, subject to interpretation. Connick stated that Brady is "an elastic thing, according to some of the justices too, and that makes it a little more difficult to find a—a standing definition of what Brady is. It depends on the evidence, I guess, but primarily the interpretation of Brady by judges." Williams, who prosecuted Thompson for both the armed robbery and the murder, testified as follows:

> Q: Even though you went to law school and you read case reports and you read opinions as they came out, there were still gray areas [regarding Brady] to an educated lawyer such as yourself?
>
> [Williams]: Yes.

Whittaker agreed with that same sentiment:

> Q: You would agree with me that under Brady there can be some gray areas?
>
> [Whittaker]: Correct.
>
> Q: Sometimes it's not crystal clear whether a document or piece of information has to be turned over to the defense or not?
>
> A: That's true.

Besides the difficulty in interpreting Brady, there was evidence that many of the attorneys in the DA's Office were only a few years out of law school, and thus lacking the legal experience that could have helped them clarify Brady issues without additional training.

> Q: Would you agree with me that in 1985, many of the assistants, the Assistant District Attorneys in your office were coming fresh out of law school?
>
> [Connick]: Yes.
>
> Q: And in 1985, you had section chiefs that were less than four years out of law school, like Mr. Dubelier, for example?
>
> A: Yes.

Whittaker further testified:

> Q: And decisions on whether to produce Brady material, whether material was Brady material and had to be produced, those kinds of decisions would sometimes get made by inexperienced lawyers, just a few weeks out of law school with no training?
>
> [Whittaker]: I imagine that's certainly possible, yes.

Finally, Whittaker also testified that training in Brady would have been helpful:

> Q: It would have been helpful to have a little training, wouldn't it, to kind of show you when you started what the Brady rule was so you could deal especially with those gray areas?
>
> [Whittaker]: I think it would be a good thing, yes.

Thus, the jury heard evidence that attorneys, often fresh out of law school, would undoubtedly be required to confront Brady issues while at the DA's Office, that

21

erroneous decisions regarding Brady evidence would result in serious constitutional violations, that resolution of Brady issues was often unclear, and that training in Brady would have been helpful.

Consequently, Thompson has met his burden of demonstrating that it was obvious that training about Brady was necessary and that a highly predictable consequence of failing to train attorneys about Brady was the infringement of the constitutional rights of those accused of crimes, such as Thompson.[12] No pattern of similar violations was necessary to put Connick on notice that training on Brady's requirements was needed.[13] Therefore, under the tests set out in City of Canton and Board of the County Commissioners v. Brown, Thompson did not need to prove a pattern of Brady violations to demonstrate that the failure to train was deliberately indifferent, and the district court did not err in denying Thompson's motion for judgment as a matter of law on that ground. See Walker v. City of New York, 974 F.2d 293, 300 (2d Cir. 1992) (finding that a plaintiff sufficiently alleged deliberate indifference in failing to train on Brady even though no pattern of violations was mentioned).

2.    Deegan's Act Broke Causation

Defendants next contend that Deegan's unanticipated action in intentionally hiding the blood evidence in violation of Connick's policy requires the conclusion that Connick was not deliberately indifferent and breaks any causal link between the alleged failure to train and Thompson's injury. Thompson responds that there was sufficient evidence for the jury to conclude

---

[12] We do not hold as a matter of law that Brady training is always required. Our decision is based on the specific facts of this case that demonstrated that, at least in the Orleans Parish DA's Office in 1985, Brady training was needed.

[13] As discussed below, the jury heard ample evidence from which it was entitled to conclude that Connick provided no Brady-specific training. Thus, this is not a case wherein the plaintiff failed to raise questions about the adequacy of on-the-job or other forms of training. Cf. Burge II, 336 F.3d at 372–73 (refusing to consider single-incident liability in which there was no evidence of inadequacy of on-the-job training).

that Deegan was not solely responsible for the constitutional violations in this case.

Defendants first argue that there must be evidence that Connick knew of and failed to control Deegan's "known propensity" for violating the constitutional rights of others to demonstrate deliberate indifference. See Roberts, 397 F.3d at 292. This assertion is incorrect. Failing to control an employee's known propensity for violating the law is only one of several ways to demonstrate deliberate indifference. See Sims v. Adams, 537 F.2d 829, 831–32 (5th Cir. 1976) (listing multiple ways to establish a supervisory defendant's § 1983 liability, including failing to act despite knowledge of an employee's propensity for misconduct). In Roberts, the court confronted a situation in which the training was adequate. 397 F.3d at 294 (referencing the "overwhelming evidence" that the officer was adequately trained). In light of this, the plaintiff in that case had to prove that the police chief knew that, despite his training, the officer was still committing improper acts; the plaintiff failed to show inadequate training generally. Thus, failing to demonstrate that Deegan had a known propensity for hiding Brady material is not dispositive of Thompson's claim; he did not pursue that theory of liability but rather alleged a failure to adequately train, supervise, and monitor.

Defendants next cite the Fourth Circuit's opinion in Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994), for the proposition that a supervisor cannot reasonably be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct. Although we have no grounds to disagree with that statement, the Fourth Circuit's reasoning is not entirely applicable in this case. Shaw refers to anticipating misconduct from "properly trained employees." Id. (internal quotation marks omitted). As discussed later in this opinion, there was evidence

that the attorneys in this case were not trained on Brady's requirements. Therefore, Shaw does not mandate a verdict for Defendants.

Defendants also generally allege that Deegan's confession to Riehlmann exculpates them from any failure to train because Deegan intentionally acted against his training in suppressing the evidence. However, Defendants read more into Deegan's statement to Riehlmann than is actually there. According to Riehlmann's affidavit, "the late Gerry Deegan said to me that he had intentionally suppressed blood evidence in the armed robbery trial of John Thompson that in some way exculpated the defendant." At trial, Riehlmann recalled that Deegan made this statement in April 1994, shortly after Deegan had been diagnosed with terminal cancer.

To begin with, Riehlmann's statement that Deegan's act was "intentional" does not necessarily mean that Deegan acted with criminal intent. It could be interpreted by the jury to mean that Deegan's actions were deliberate and that he did not accidentally lose the evidence. Further, Deegan never explained why he suppressed the evidence. It could be that Deegan did not understand his Brady obligations at that time, but in the period between 1985 and his confession in 1994, he came to understand that his actions were wrong. As described earlier, several of the former assistant district attorneys testified that their Brady obligations were not always clear. It is not unreasonable to conclude that Deegan suffered from a similar lack of understanding.[14]

---

[14] Indeed, Williams, Deegan's co-counsel in the armed robbery case, continued to display some confusion over Brady when he testified in the instant matter that Brady evidence did not include documents that could be used to impeach a witness; instead, he stated that Brady evidence is only evidence which would tend to exculpate a person charged with a crime. Impeachment evidence has been considered Brady material since 1972. See Giglio, 405 U.S. at 154. As discussed below, numerous witnesses expressed similar uncertainty about the duty to turn over exculpatory blood evidence if they were not aware of the defendant's blood type. Defendants do not, however, challenge the district court's ruling as a matter of law (based on the holding of the Louisiana court of appeals) that the nonproduction of the blood evidence was a violation of Brady's requirements.

The evidence Defendants presented was also ambiguous as to whether Deegan was the only person who was aware of the blood evidence. Riehlmann's testimony at trial confirmed the uncertainty of his recollection of Deegan's statement:

Q: Did he say that anyone else was involved with the suppression or did he just simply say, "I did it"?

[Riehlmann]: He may have said that someone else was involved, but I don't recall.

Riehlmann also explained that he could not say whether Deegan told him that Dubelier or Williams were involved. Further, Riehlmann admitted that he did not know to what piece of evidence Deegan was referring—the bloody pants leg, the blood report, or both:

Q: Mr. Deegan didn't tell you specifically about a blood report as opposed to blood evidence, did he?

[Riehlmann]: I don't remember exactly what he said.

Thus, Riehlmann's recollection of Deegan's confession does not rule out the possibility that someone else could have been involved in the suppression of either the bloody pants leg or the blood report.

In contrast to Defendants' theory, the jury heard evidence suggesting that the Brady violation was not solely the result of Deegan's actions. Whittaker testified that he had seen the report and placed it on Williams's desk, and Riehlmann testified that he had no reason to believe that Deegan would have taken the report off of Williams's desk. Although denying that he ever saw the report, Williams admitted that he was aware there was blood evidence in the case and that he deliberately avoided mentioning blood evidence at Thompson's armed robbery trial. Former assistant district attorney Glas testified that he helped investigate the incident when it was brought to Connick's attention in 1999 and that it was his impression that Whittaker and Williams were covering something up. Also, according to Glas, Williams told Jay LaGarde that the blood

25

evidence was "inconclusive." Thus, although there was evidence that Deegan acted alone, there is also evidence from which the jury could have believed that others had a hand in failing to turn over the exculpatory evidence.

Further, throughout the trial of this matter, Defendants attempted to place the blame for Thompson's conviction on Numa Bertel ("Bertel"), Thompson's defense counsel at his armed robbery case. Defendants argued that, because Williams stated at the motion to suppress hearing that the government wanted to take Thompson's blood, Bertel should have been aware that there was blood evidence and made an effort to discover it. Such reasoning could easily be applied to Defendants in this case, whose knowledge of the blood evidence was superior to Bertel's.

In sum, then, drawing all inferences in favor of Thompson, a reasonable jury could have believed that the constitutional violations in this case were not solely attributable to Deegan's alleged criminal conduct, but instead were the result of confusion over Brady by various attorneys in the DA's Office.[15] "A jury verdict must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." Int'l Ins. Co. v. RSR Corp., 426 F.3d 281, 296–97 (5th Cir. 2005) (internal quotation marks omitted). Because there is a legally sufficient evidentiary basis for the jury's verdict, we may not reverse on this ground.

3. The Blood Evidence Was Obviously Exculpatory

Next, Defendants assert that because the blood evidence was obviously exculpatory and withholding the evidence was such a clear violation of the law,

---

[15] We also note that Defendants' argument on this point says nothing about the police reports that were not turned over to defense counsel in the murder trial. The police reports were thoroughly discussed at the trial of this matter and Defendants disputed among themselves whether the police reports were Brady material that needed to be disclosed to Thompson. Deegan was not involved in the murder trial; therefore, Deegan did not cause any constitutional violations with respect to that trial and the withheld police reports.

no training could have helped in this instance. Defendants rely on Burge v. Parish of St. Tammany (Burge I), 187 F.3d 452 (5th Cir. 1999), for their claim that there can be no failure to train when the evidence is obviously exculpatory. In Burge I, the plaintiff claimed that the district attorney failed to implement policies and training to ensure that all materials, including exculpatory evidence, that were gathered by the Sheriff's Office were transmitted from the Sheriff to the District Attorney and then disseminated to the appropriate assistant district attorneys and turned over to the criminal defendants. Id. at 472. After reviewing the evidence, the court determined that there was no deliberate indifference. Id. at 473. The court went on to state that, even if the training were inadequate, the material at issue "was of such a quality and quantity that any reasonably qualified and experienced prosecuting attorney would have recognized it as Brady material that he was required to disclose." Id. at 475. Therefore, any alleged failure to train did not cause the constitutional violation. Id.

The problem with Defendants' argument in this case is that several of Defendants' own witnesses contended that the blood evidence was not Brady material in the absence of knowledge of Thompson's blood type. Val Solino ("Solino"), the Rule 30(b)(6) representative for the DA's Office, testified that,

> [I]f I'm holding a crime lab report that says blood on a shoe is B, and I have some reason to believe that the blood on the shoe came from the perpetrator, and I don't know what the perpetrator's blood type is, do I feel I have a legal requirement at that point to disclose that lab report? No.[16]

Glas testified that, in 1999, Connick argued with him that there was no duty to turn over the report unless the attorney knew that it did not match Thompson's

---

[16] Solino later attempted to modify that statement by claiming that he would not have disclosed the report upon receipt of it, but "one minute or one second" later, he would have taken further steps to see if it should be disclosed.

blood type. Although Williams later testified that he would have turned the report over, he stated that, had he been in charge of responding to Thompson's request for evidence in the armed robbery trial, he would simply have responded that the evidence was "available for inspection." With respect to the withheld police reports, Dubelier argued at trial that he was not required under Brady to turn them over.

Therefore, despite Defendants' current argument on appeal, Defendants' position at trial was less than clear about whether the evidence at issue was obviously exculpatory. Given Defendants' conflicting claims, there is no cause to overturn the verdict on the ground that the material was obviously exculpatory.

### 4. Connick Provided Adequate Training, Supervision, and Monitoring

Defendants' next contention is that Connick provided adequate training in the form of on-the-job training, Saturday training sessions, dissemination of memos and case opinions, and counseling. Further, each attorney had received training in law school and participated in self-training after law school. In support of their argument, Defendants rely on two cases from this court that concern training on Brady issues.

First, in Burge I, the evidence showed that there was no special training program on Brady. 187 F.3d at 471. Instead, the District Attorney "relied on the professional education, training, experience, and ethics of [his subordinates] in the performance of their constitutional responsibilities." Id. However, the plaintiff in Burge I did not "focus directly on the adequacy of the training or supervision of the District Attorney's assistants and employees in relation to the tasks that particular persons must perform" but instead attempted to identify deficiencies in the procedures relating to the surrender of Brady material. Id.

at 473. Thus, the office procedures related to Brady materials were called into question in Burge I, not the training on Brady.[17]

Defendants also rely on this court's decision in Cousin v. Small, 325 F.3d 627 (5th Cir. 2003), which, like the instant appeal, concerned the Orleans Parish DA's Office's failure to train on Brady issues. There, however, the plaintiff conceded that the training on Brady was adequate in 1995. Id. at 629, 638. That concession says nothing of the training, supervision, and monitoring that existed when the DA's Office tried Thompson in 1985.[18] Thus, neither Burge I nor Cousin stands for the proposition that a district attorney may rely solely on the law school or on-the-job training of attorneys.

Although there was some evidence in this case that attorneys in the DA's Office might have received some training, the jury was entitled to believe the ample evidence that the attorneys received no training on Brady's requirements. None of the three prosecutors involved in Thompson's prosecutions recalled receiving any Brady-specific training. For example, Williams testified that he did not recall any training related to Brady's requirements:

Q: What type of training was there at the DA's office regarding Brady material?

[Williams]: Again, I don't recall any specific training.

Dubelier testified similarly:

---

[17] When the case returned in Burge II, this court held that in some instances on-the-job training regarding such procedures may be sufficient. See 336 F.3d at 373. We did so, however, after the plaintiff produced no evidence showing its inadequacy. See id. ("Unlike the facts of [Brown v.] Bryan County," which permitted single-incident liability, "there is no evidence in the present case . . . that the on-the-job training those employees received was inadequate."). Here, Thompson produced substantial evidence that any on-the-job training was inadequate.

[18] The DA's Office changed its Brady-related instruction between Thompson's trials and the events in Cousins. According to Defendants' witnesses in this case, around 1987, the DA's Office codified its policy regarding disclosure of Brady-related materials. Later, in the 1990s, it began a continuing legal education program that covered Brady's requirements.

Q:  Do you recall any specific Brady training?

[Dubelier]:  I don't recall specifically any training.

As did Whittaker:

Q: So they didn't sit down and do a little seminar for you on what Brady was and how to live with it?

[Whittaker]:  Not that I recall.

Other attorneys in the DA's Office at the time of Thompson's prosecutions testified consistently. For example, Riehlmann stated, "To answer your question specifically as it relates to Brady, I don't recall that I was ever trained or instructed by anybody about my Brady obligations, no." Indeed, the government stipulated that "[n]one of the district attorney witnesses recalled any specific training session concerning Brady prior to or at the time of the 1985 prosecutions of Mr. Thompson."[19] That is, no prosecutor testified about a specific example of Brady-related on-the-job training, Brady-related Saturday training sessions, Brady-related advance sheets, or counseling or pretrial of a case that resulted in Brady-specific discussions.  This evidence supported the jury's finding that Connick failed to adequately train his attorneys on Brady and lent credence to the district court's conclusion that Thompson did not need to prove a pattern of similar violations, as discussed above. See City of Canton, 489 U.S. at 390 n.10; Walker, 974 F.2d at 300 ("[W]e conclude that a complete failure by the DA in 1971 to train ADAs on fulfilling Brady obligations could constitute deliberate indifference sufficient to give rise to § 1983 municipal liability.").

5.    Miscellaneous Arguments

Defendants make two other arguments regarding the sufficiency of the evidence in this case: that there was no evidence (1) that Connick was deliberately indifferent in failing to establish policies or procedures to ensure the

---

[19] Further, Connick himself testified that he "stopped reading law books" when he became District Attorney in 1974.

acquisition of Brady material from the police department and (2) that Connick was deliberately indifferent to the need to establish an open-file policy. Neither argument merits much attention.

The need for a policy to ensure the acquisition of Brady material from the police department was not a theory of liability argued to the jury. It came up in a roundabout way in the post-trial briefing, and there is no indication that the district court relied on any arguments in that regard. The open-file policy was mentioned at trial, but only in the context that the lack of an open-file policy increased the need to make sure that the attorneys understood Brady. Again, it was not argued to the jury as a theory of liability. Therefore, there is no basis for reversal on either of these grounds.

C.    Jury Instructions

Defendants next argue that the district court erred in its instructions to the jury regarding deliberate indifference and by not giving the jury various other instructions. We review a jury charge for abuse of discretion. Julian v. City of Houston, 314 F.3d 721, 727 (5th Cir. 2002). In doing so, we use a two-pronged standard of review to assess the propriety of the given instructions:

> First, the challenger must demonstrate that the charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations. Second, even if the jury instructions were erroneous, we will not reverse if we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case.

Johnson v. Sawyer, 120 F.3d 1307, 1315 (5th Cir. 1997) (internal quotation marks and citation omitted).

"A prerequisite to our review of the instructions in this manner, however, is that the objection must have been brought to the attention of the district court at trial." Navigant, 508 F.3d at 293 (internal quotation marks omitted). Pursuant to Federal Rule of Civil Procedure 51(c)(1), "[a] party who objects to an

instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Failure to properly object to an instruction will result in a plain error review, which will require Defendants to establish (1) error; (2) that is clear or obvious; (3) that affects substantial rights; and (4) that, consistent with the court's discretion, not correcting the error would seriously affect the fairness, integrity, or public reputation of the judicial proceedings. See Wright v. Ford Motor Co., 508 F.3d 263, 272 (5th Cir. 2007). With that in mind, we turn first to the instructions regarding deliberate indifference.

### 1. Deliberate Indifference Instructions

Because the jury found that the DA's Office was deliberately indifferent to the need to train its attorneys on Brady, many of Defendants' arguments concerning the jury instructions have to do with the issue of deliberate indifference. Defendants argue that the district court (1) failed to properly define deliberate indifference for the jury, (2) incorrectly indicated that an unintentional failure to monitor was sufficient for liability, and (3) incorrectly stated that deliberate indifference did not necessarily mean intentional. We address each argument in turn.

### a. Failure to Define Deliberate Indifference

Defendants assert that, although the district court informed the jury of what deliberate indifference was not (negligence or gross negligence), the district court never explained to the jury what deliberate indifference was, leaving the jury to guess at the term's meaning. Defendants did not raise this objection before the district court, so we review their claim for plain error. See Navigant, 508 F.3d at 295–96.

Having reviewed the jury instructions given by the district court, we conclude that Defendants' assertion is unfounded. As noted earlier, on the topic of deliberate indifference, the district court instructed the jury as follows:

Deliberate indifference requires a showing of more than negligence or even gross negligence. For liability to attach because of a failure to train, the fault must be in the training program itself, not in a particular prosecutor. In order to find that the district attorney's failure to adequately train, monitor, or supervise amounted to deliberate indifference, you must find that Mr. Thompson has proved each of the following three things by a preponderance of the evidence:

First: The District Attorney was certain that prosecutors would confront the situation where they would have to decide which evidence was required by the Constitution to be provided to an accused.

Second: The situation involved a difficult choice, or one that prosecutors had a history of mishandling, such that additional training, supervision, or monitoring was clearly needed.

Third: The wrong choice by a prosecutor in that situation will frequently cause a deprivation of an accused's constitutional rights.

To paraphrase, then, the district court told the jury that for a failure to train to be deliberately indifferent, there must be proof that the District Attorney knew that prosecutors would be confronted with difficult legal issues that had a substantial impact on Defendants' constitutional rights.[20]

This tracks the Supreme Court's requirement that a failure to train is deliberately indifferent when "the need for more or different training is . . . obvious, and the inadequacy . . . likely to result in the violation of constitutional rights." City of Canton, 489 U.S. at 390; see also Estate of Davis, 406 F.3d at 381 (stating that an official acts with deliberate indifference when he "disregard[s] a known or obvious consequence of his action" (internal quotation marks omitted)). Indeed, in their proposed jury charge, Defendants themselves

---

[20] The three-step structure of the jury instructions came from the Second Circuit's opinion in Walker, 974 F.2d at 297–98.

33

requested a nearly identical instruction regarding the above three-element standard.

Thus, rather than leaving the jury with nothing on which to base its decision, the district court spelled out the requirements of deliberate indifference as described by the Supreme Court and this court. Further, as discussed below, the district court correctly informed the jury that deliberate indifference was more than negligence and gross negligence, but less than intentional. Consequently, we find no error, plain or otherwise, in this aspect of the district court's instructions.

b. Response to Jury Question

Defendants next contend that the district court's response to the jury's question was erroneous because it left the jury with the impression that deliberate indifference could mean any unintentional failure to monitor. As noted earlier, the jury sent out the following question during its deliberations:

> What does "Deliberate" Indifference mean? Does it mean intentional or would "Failure to monitor" be considered Deliberate?

The district court responded:

> "Deliberate Indifference" does not necessarily mean intentional, but does require more than mere negilgence [sic] or even gross negligence. Please refer to pages 26 + 27 of the legal instructions for further guidance.

Defendants interpret the jury's question as presenting two options of what deliberate indifference might mean: (1) intentional conduct or (2) any unintentional failure to monitor. Because the district court stated that deliberate indifference was not necessarily intentional, Defendants assert that the jury must have believed that any unintentional failure to monitor was sufficient.

Review of the transcript of the discussion between the court and counsel regarding how to respond to the jury's question reveals that defense counsel did

34

not raise this point of alleged error before the district court. Regardless, we see no error in the district court's response. Defendants' assertion that the jury could have believed that any "unintentional" failure to monitor was sufficient lacks support in the record. The jury was instructed that the failure to train or monitor had to be "deliberate" and could not be based on mere negligence or gross negligence. Therefore, contrary to Defendants' claims, any "unintentional" act would not have been sufficient to create liability.

"When evaluating the adequacy of supplemental jury instructions, we ask whether the court's answer was reasonably responsive to the jury's question and whether the original and supplemental instructions as a whole allowed the jury to understand the issue presented to it." United States v. Stevens, 38 F.3d 167, 170 (5th Cir. 1994). In doing so, we give the district court wide latitude in deciding how to respond to such questions. Id. Here, the jury note indicated confusion over the appropriate level of fault. The district court's response reiterated the appropriate level and directed the jury back to the relevant section of the jury charge that described deliberate indifference in more detail.[21] If, in response to a jury question, the district court directs the jury's attention to the original instructions, the response is deemed sufficient if the original instructions are an accurate statement of the law. United States v. Arnold, 416 F.3d 349, 359 n.13 (5th Cir. 2005). We presume the jury followed the instructions of the district court, see Hollis v. Provident Life & Accident Ins. Co., 259 F.3d 410, 417 (5th Cir. 2001), and the instructions did not permit a finding of liability based on an "unintentional" failure to monitor.[22]

---

[21] Pages 26 and 27 of the jury instructions contain the three-part description of deliberate indifference quoted earlier.

[22] To the extent that Defendants complain about the "failure to monitor" theory being included in the charge, we find no error. Defendants never objected to that language before the district court and even proposed a jury charge that included "failure to supervise or train" language.

c.     Intentional Conduct

Defendants next assert that the district court's response that deliberate indifference "does not necessarily mean intentional" is an inaccurate statement of the law.  It is questionable whether Defendants adequately preserved this objection.  During the colloquy regarding the jury note, defense counsel stated, "It has to be, you know, if not completely intentional, I think it should be either intentional or reckless disregard, he just didn't care about it."  However, defense counsel later stated, "Mr. Connick suggested to me that he thinks the word deliberate means intentional."  Because we conclude that the district court's statement was legally correct, we do not need to determine whether the appropriate standard of review is abuse of discretion or plain error.

Defendants cite several cases for the proposition that deliberate indifference requires a "conscious disregard for the known and obvious consequences of [one's] actions," Bd. of the County Comm'rs v. Brown, 520 U.S. at 413 n.1, or that it is "an intentional choice, not merely an unintentionally negligent oversight."  Rhyne v. Henderson County, 973 F.2d 386, 392 (5th Cir. 1992).[23]  This court has recognized, though, that deliberate indifference and intent are not the exact same standard, as deliberate indifference is "a lesser form of intent."  Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 453 n.7 (5th Cir. 1994) (internal quotation marks omitted).  Further, the Supreme Court is well aware of the standard of intent but chose to set the level of fault in failure-to-train cases as deliberate indifference.  See City of Canton, 489 U.S. at 388.  In the context of municipal liability under § 1983 for failure to train, deliberate indifference is akin to objective recklessness.  See Farmer, 511 U.S. at 840–41

---

[23] We do not consider the cases cited by Defendants that describe deliberate indifference in the context of the Eighth Amendment, as the Supreme Court has held that to be a different standard than the one articulated in City of Canton.  See Farmer v. Brennan, 511 U.S. 825, 841 (1994) (noting that the deliberate indifference standard in City of Canton "is not an appropriate test for determining the liability of prison officials under the Eighth Amendment").

(describing Canton's standard as "objective" because it permits "liability to be premised on obviousness or constructive notice").

Therefore, it would have been incorrect to instruct the jury that deliberate indifference means intentional indifference, as precedent establishes that the terms are not interchangeable. Consequently, Defendants have failed to establish reversible error with respect to the deliberate indifference instructions given by the district court.

2.    Other Missing Jury Instructions

Finally, Defendants contend that the jury instructions never informed the jury about how to treat certain pieces of evidence, namely (1) the type of training that was provided, (2) Deegan's unanticipated actions, and (3) the lack of a pattern of Brady violations. We have explained,

> [A] district court's refusal to give a requested jury instruction is reversible error only if the instruction [(1)] was a substantially correct statement of law, [(2)] was not substantially covered in the charge as a whole, and [(3)] concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the [party's] ability to present a given claim [or defense.]

Kanida v. Gulf Coast Med. Pers., L.P., 363 F.3d 568, 578 (5th Cir. 2004) (fifth alteration in original) (internal quotation marks omitted).

On appeal, Defendants proffer seventeen different instructions that they contend should have been given. Although Defendants included these instructions in their proposed jury instructions filed before trial, Defendants only specifically objected to the absence of two instructions: (1) there can be no deliberate indifference if an attorney intentionally ignores his training and (2) proof of deliberate indifference requires evidence of a pattern of violations.

As for the first instruction, it was covered by the jury charge and, in any case, we do not agree that the failure to give this instruction seriously impaired Defendants' ability to present their argument. Defendants' proffered instruction goes to causation—whether the Brady violation was caused by a failure to train

or by something else, such as a deliberate criminal act. The jury instructions stated, "For liability to attach because of a failure to train, the fault must be in the training program itself, not in a particular prosecutor." This instruction clearly subsumes Defendants' proposed instruction. Moreover, such reasoning is simply common sense. Defendants were not impaired in any way from making that claim, and they strongly argued to the jury that the Brady violation was due solely to Deegan's intentional criminal act. Therefore, there is no reversible error in failing to include that instruction.

As to Defendants' second rejected instruction regarding evidence of a pattern of violations, for the reasons stated above, see supra Section III.B.1, that was not a correct legal statement in the context of this case and Thompson's theory of liability. Therefore, the district court did not err in failing to instruct the jury in that regard.

The remaining instructions that Defendants urge on appeal were not specifically objected to before the district court; thus, we review the district court's action only for plain error. See Navigant, 508 F.3d at 295–96. The instructions currently sought by Defendants include instructions that on-the-job training can be sufficient, that law school training can be sufficient, and that no training would have helped if the evidence was obviously Brady material. Again, there is nothing that prevented Defendants from making these claims to the jury—they are common sense arguments that do not need the imprimatur of the court to be effective.

In sum, the district court did not need to tell the jury the possible effect of every single piece of evidence. Much of that should be and was done by the attorneys during closing arguments. Because Defendants have not shown that they were seriously impaired in making their defense, we find no reversible error in the district court's refusal to give the requested instructions.

D. Exclusion of Guilt-Related Evidence

Defendants next assert that the district court erroneously precluded them from introducing evidence that Thompson was actually guilty of the Liuzza murder. The issue arose when Thompson filed a motion in limine asking the district court to (1) preclude Defendants from arguing that Thompson was guilty of murdering Liuzza and (2) exclude evidence bearing solely on Thompson's guilt or innocence of the murder. The district court granted the motion in limine and stated that "[t]he issue of the plaintiff's guilt has already been decided at the second murder trial."

On appeal, Defendants contend that evidence of Thompson's guilt was necessary to establish that Thompson's incarceration and resulting damages were not caused by the Brady violation, but rather by Thompson's own guilt. Thompson counters that the issue of his guilt was established at his second murder trial when he was found not guilty and that Defendants are collaterally estopped from attacking that result. This court reviews a district court's evidentiary rulings for abuse of discretion. Triple Tee Golf, Inc. v. Nike, Inc., 485 F.3d 253, 265 (5th Cir. 2007). If we determine that the district court abused its discretion, we then apply the harmless error doctrine. Id. Thus, unless a substantial right of the complaining party is affected, we will affirm the ruling. Id.

To begin with, we note that to the extent the parties argue about "guilty" and "innocent," they misstate the relevant question—the key question for causation purposes is whether the prosecution could have proven Thompson's guilt beyond a reasonable doubt after turning over the Brady evidence, not whether Thompson was actually guilty. Thus, to establish that Defendants' Brady violation did not cause the guilty verdict, Defendants would have had to demonstrate that they could still prove Thompson was guilty beyond a reasonable doubt in the absence of the violation. That is exactly what the DA's

Office unsuccessfully attempted to do at Thompson's second murder trial in which he was found not guilty.

Although the district court did not reference collateral estoppel, we find that the doctrine provides support for the district court's conclusion. Collateral estoppel applies when (1) the issue at stake in the current litigation is the same as the one in the previous litigation, (2) the issue was actually litigated in the previous litigation, and (3) the determination of the issue in the previous litigation was a necessary part of the judgment. Harvey Specialty & Supply, Inc. v. Anson Flowline Equip., Inc., 434 F.3d 320, 323 (5th Cir. 2005). Here, the issue is whether Defendants can demonstrate that Thompson is guilty of the Liuzza murder beyond a reasonable doubt so that they can claim that the Brady violation did not cause Thompson's conviction. Whether Thompson was guilty beyond a reasonable doubt was exactly what was at stake in Thompson's second murder trial.[24] The issue was actually litigated, and its determination was necessary to the judgment. Therefore, Defendants are collaterally estopped from attempting to prove (for the third time) that Thompson murdered Liuzza. Accordingly, we will not reverse the district court's judgment on this ground.

E.    Amount of Damages

Defendants next argue that the $14 million in damages awarded by the jury is excessive and not warranted by the evidence. Because Defendants moved for a remittitur before the district court, we review the denial of the remittitur for an abuse of discretion. See Vogler v. Blackmore, 352 F.3d 150, 154 (5th Cir. 2003). We may order a remittitur only if we are "left with the perception that the verdict is clearly excessive." Alameda Films S A de C V v. Authors Rights Restoration Corp., 331 F.3d 472, 482 (5th Cir. 2003) (internal quotation marks

---

[24] Defendants argue that their key witness, Freeman, was not available at the second murder trial. The criminal district court, however, permitted Defendants to read the relevant portions of Freeman's testimony from the first trial into evidence.

omitted); see also Ham Marine, Inc. v. Dresser Indus., Inc., 72 F.3d 454, 462 (5th Cir. 1995) (per curiam) (stating that damages are excessive when they are "so large as to shock the judicial conscience, so gross or inordinately large as to be contrary to right reason, [or] so exaggerated as to indicate bias, passion, prejudice, corruption, or other improper motive" (internal quotation marks omitted)).

Defendants argue that Thompson's experiences in prison were not worth $14 million in damages because (1) he was not raped in prison, (2) he was not denied food or medicine, (3) he had visits from friends and family, (4) he made friends with other inmates, (5) he was able to watch television and play chess, and (6) he had been in jail previously for smaller crimes. Defendants also note that Thompson has been doing well since his release and refers to himself as "blessed." To limit Thompson's experiences to these few facts, however, would present a misleadingly rosy picture of Thompson's life both in prison and after his release.

The evidence at trial showed that Thompson was arrested when he was twenty-two years old and was not released until he was forty. He spent the first two and a half years in the Orleans Parish Prison, where he was housed with the hard core criminals, four or five to a cell. He witnessed multiple rapes and lived in fear of becoming a victim himself. During his time at the Orleans Parish Prison he received only two visits from his family.

In 1987, Thompson was transferred to the Angola State Penitentiary, where he was kept in solitary confinement. He spent twenty-three hours a day in a six-by-nine-foot cell with no windows or air conditioning. Upon entering his cell for the first time, he found personal items from its previous occupant, who had been executed several days before. There were multiple mentally deranged prisoners near him who would yell and scream at all hours and throw human waste at the guards. Indeed, several witnesses testified to the stench that

permeated the prison. Thompson grew to know many of his fellow inmates and was aware when they were executed. Thompson himself was given approximately six execution dates during his time there and, as stated earlier, came within one month of his final execution date. While at Angola, he received approximately four visits a year from friends and family.

Thompson himself testified to the mental anguish he suffered as a result of his incarceration. The guilty verdict in the armed robbery case "destroyed" him and "tore [him] down." His mother, girlfriend, and two sons witnessed the jury hand down his death sentence. His girlfriend, who he had planned to marry, married someone else. His grandmother, who had raised him, died during his time at Angola. His sons grew up without a father. Thompson's final execution date was to be the day before his youngest son graduated from high school. Thompson testified that he would have preferred to be executed than to spend the rest of his life in prison.

Since his release, Thompson has done relatively well considering that he was removed from society for eighteen years. He has married, held several jobs, and is starting an organization to help individuals who have been released from prison after being exonerated. However, Dr. Stuart Grassian, who testified as an expert in the field of psychiatry and mental and emotional illness, specifically in the area of the consequences of long-term confinement, solitary confinement, and incarceration on death row, has diagnosed Thompson with chronic post-traumatic stress disorder. Dr. Grassian described to the jury in detail the suffering of being in solitary confinement with nothing to distract a person from his impending death.

Dr. Grassian stated that, although Thompson suffers from the symptoms of chronic post-traumatic stress disorder, Thompson's strong character has enabled him to function in spite of his pain. Dr. Grassian further described Thompson's feelings of inadequacy and shame over his inability to perform

simple tasks, such as using a cell phone or copy machine, that Thompson never learned as a result of his incarceration. According to Dr. Grassian, Thompson is "constantly startled, constantly vigilant, . . . constantly afraid." Dr. Grassian does not see much likelihood that Thompson's symptoms will change over time.

Given the entirety of the testimony about Thompson's experiences and suffering as a result of his wrongful incarceration, we cannot say that the jury clearly erred in awarding him $14 million in damages or that the district court abused its discretion in refusing to order a remittitur. See Primrose Operating Co. v. Nat'l Am. Ins. Co., 382 F.3d 546, 559 (5th Cir. 2004) (stating that "reversal is proper only if no reasonable jury could have arrived at the verdict").

Defendants also make a passing assertion that similar cases have resulted in awards of, at most, $400,000 a year, whereas here, Thompson received over $700,000 a year for his eighteen years of imprisonment. See Jenkins v. Baldwin, 801 So. 2d 485, 491 (La. Ct. App. 2001) (trial court awarded $12 million for thirty years of incarceration plus over $650,000 in lost wages); Gibson v. State, 731 So. 2d 379, 380 (La. Ct. App. 1999) (trial court awarded $5 million for twenty-four years of incarceration plus over $1.6 million in past and future lost income), rev'd, 758 So. 2d 782 (La. 2000). However, Defendants fail to cite to a single Louisiana case in which the appropriate amount of damages for a wrongful incarceration was at issue. See Jenkins, 801 So. 2d at 501 (failing to reach excessive damages issue because case was reversed); Gibson, 731 So. 2d at 385 (refusing to address issue of damages because it was not raised on appeal).[25] Further, neither case cited by Defendants concerned an individual who had been

---

[25] Through our own research, we have discovered a Louisiana case in which the court held that a wrongfully incarcerated plaintiff was entitled to $40,000 in damages for only twenty-three days of imprisonment. See Mairena v. Foti, 816 F.2d 1061, 1063 (5th Cir. 1987) (finding that the district attorney was responsible for three-quarters of the plaintiff's damages and therefore assessing an award of $30,000 against the district attorney). This translates to over $600,000 a year for an imprisonment that did not involve death row.

wrongfully sentenced to death. Therefore, we find this claim unavailing and affirm the decision of the district court to deny Defendants' request for a remittitur.

F.    Attorneys' Fees

Finally, Defendants appeal the district court's decision to award Thompson $1,031,841.79 in attorneys' fees pursuant to 42 U.S.C. § 1988(b). The calculation of attorneys' fees under § 1988 is a two-step process. First, the court must calculate the "lodestar" fee. Migis v. Pearle Vision, Inc., 135 F.3d 1041, 1047 (5th Cir. 1998); see also Riley v. City of Jackson, 99 F.3d 757, 760 (5th Cir. 1996). The lodestar amount is determined by "multiplying the reasonable number of hours expended on the case by the reasonable hourly rates for the participating lawyers." Migis, 135 F.3d at 1047. Second, the court decides whether the lodestar amount should be adjusted upward or downward based on the circumstances of the case using the factors articulated in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717–19 (5th Cir. 1974). Migis, 135 F.3d at 1047. The twelve Johnson factors are

> (1) the time and labor required for the litigation; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Id. (citing Johnson, 488 F.2d at 717–19). We review the district court's determination of reasonable hours and rate for clear error and its application of the Johnson factors for abuse of discretion. Id.

We start by observing that, other than a citation to Johnson, Defendants cite no case law in support of their arguments on this point. Although

Defendants claim to "incorporate" their arguments before the district court, it is well-established in this circuit that we will not consider arguments by incorporation. Turner v. Quarterman, 481 F.3d 292, 295 n.1 (5th Cir.), cert. denied, 128 S. Ct. 34 (2007); Summers v. Dretke, 431 F.3d 861, 881 n.12 (5th Cir. 2005); Yohey v. Collins, 985 F.2d 222, 224–25 (5th Cir. 1993); see also FED. R. APP. P. 28(a)(9)(A) (requiring appellant's brief to include "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"). Further, given that Defendants' brief is already 13,977 words long and the limit is 14,000 words, see FED. R. APP. P. 32(a)(7)(B)(I), incorporation of arguments in other documents would have the improper effect of lengthening the brief beyond what is permissible. See Yohey, 985 F.2d at 225. Therefore, we limit our analysis to Defendants' somewhat conclusory allegations in their briefing.

Here, the district court first calculated the lodestar amount by considering the hours and rates charged by Thompson's counsel. The district court found nothing wrong with the amount of hours claimed by Thompson's attorneys, and Defendants do not challenge that determination on appeal. The district court then considered their requested fees, in light of the fees generally awarded in the Eastern District of Louisiana. See Green v. Adm'rs of Tulane Educ. Fund, 284 F.3d 642, 662 (5th Cir. 2002) (noting that "[r]easonable hourly rates are determined by looking to the prevailing market rates in the relevant legal community"). Thompson's Philadelphia-based counsel requested fees from $405–$625 an hour for experienced attorneys, $180–$285 an hour for associates, and $135–$225 an hour for legal and technical assistants.[26] After surveying recent awards in civil rights cases in the district, the district court decided that a reasonable fee would be 50% of the amount that Thompson's counsel sought.

---

[26] The fees are listed as ranges, as the hourly rates differed among attorneys and increased over the time period covered—2003 to 2007.

Defendants assert that the highest fee awards in the Eastern District of Louisiana are $260 for an experienced attorney, $150 for a junior attorney, and $75 for a paralegal. At the 50% rate ordered by the district court, experienced attorneys received $202–312 an hour, a mid-level associate received $90–202 an hour, a junior associate received $90–142 an hour, and the paralegals received $67–112 an hour. Thus, the fees awarded were both above and below the limits argued by Defendants. The district court also noted that Thompson's counsel wrote off 482 hours (approximately $300,000 in attorneys' fees), reduced their normal rates by 10%, and did not seek to recover for local counsel's work. The district court further stated that it was "genuinely impressed" with counsel's work and commended the skill of the attorneys. Although the fees awarded were at the upper range of what was reasonable in the district, given this explanation, we cannot say that there was clear error in calculating the lodestar amount.

We next consider whether the district court abused its discretion in increasing the amount awarded based on its consideration of the Johnson factors. The district court listed several factors as part of its decision to increase the attorneys' fees amount under Johnson, including the need for out-of-town counsel, the time limitations in place, and the special skill required. Specifically, the district court noted that Thompson's Philadelphia counsel, who had represented him for the past fourteen years, knew the case better than anyone else and were the only ones in a position to file a complaint within the time limits imposed by the statute of limitations. Further, the district court found that successful presentation of the case required exceptional ability on the part of Thompson's counsel because it is extraordinarily difficult to actually obtain a jury verdict for the plaintiff in a civil rights case.

On appeal, Defendants argue that counsel's pro bono representation of Thompson should not warrant an upward adjustment under Johnson. The district court, however, stated that Thompson's counsel would "of course remain

uncompensated" for those years of service; thus, there is no merit to Defendants' argument on that point. Defendants also assert that local counsel could have been found to bring Thompson's case in a timely fashion and that the case did not involve new or novel issues. Again, though, as noted by the district court, finding counsel who could bring the suit is not the same as finding counsel who could win the suit. Thompson's attorneys were intimately familiar with the facts of this case and were in the best position to bring Thompson's claims. Under Johnson, the skill required, the amount involved and result obtained, the time limitations imposed by the circumstances, and the nature and length of the professional relationship with the client are all factors that may be considered in adjusting a fee award. Johnson, 488 F.2d at 717–19. We find no abuse of discretion in the district court's decision to adjust the fee award for these reasons. Consequently, we affirm the attorneys' fees awarded in this case.[27]

## IV. CONCLUSION

Giving due deference to the district court's decision and the jury's verdict, we find no reversible error in this case other than the naming of non-liable parties in the judgment. Therefore, we REVERSE IN PART and REMAND with instructions to remove the non-liable defendants from the judgment. However,

---

[27] Defendants correctly argue that the district court erred in naming Connick, Dubelier, and Williams in the judgment and abused its discretion by denying their Rule 59(e) motion to alter or amend the judgment to correct this error. We have previously held that it is proper to dismiss allegations against municipal officers in their official capacities when the allegations duplicate claims against the governmental entity itself. See Castro Romero v. Becken, 256 F.3d 349, 355 (5th Cir. 2001) (noting that the official-capacity claims were duplicative of the claims against the governmental entities); cf. FED. R. CIV. P. 25(d) (providing that when a public officer is sued in his official capacity and the ceases to hold office, his successor is automatically substituted as a party). Because it is undisputed that Connick, Dubelier, and Williams are no longer employed at the DA's Office, their official capacities are non-existent, and they should not have been named in the judgment. Consequently, we reverse the district court's decision to deny Defendants' Rule 59(e) motion and remand with instructions to remove Connick, Dubelier, and Williams from the judgment. We further note that after the briefing of this case was complete, Jordan, who was District Attorney when this case began, resigned his position. Thus, pursuant to Rule 25(d), the district court should substitute the name of the current District Attorney.

we AFFIRM the remainder of the district court's judgment. Costs shall be borne by Defendants.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.